UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MATTEO ANELLO,

                    Plaintiff,

                                                    **DECISION AND ORDER**
        v.                                              09-CV-715S

ROBERT ANDERSON, JR.,
SAMUEL FRUSCIONE, and
CHRIS ROBINS,

                    Defendants.

## I. INTRODUCTION

After a four-day trial, a federal jury determined that Defendants Robert Anderson,

Jr.,[1] Samuel Fruscione, and Chris Robins violated Plaintiff Matteo Anello's First

Amendment right to free speech during a city council meeting in the city of Niagara

Falls, NY, on October 22, 2007.   The jury awarded Anello a total of $30,000 in

compensatory damages and $75,000 in punitive damages.

Presently before this Court are several post-trial motions.   First, Defendants

move for Judgment as a Matter of Law and for a New Trial under Rules 50 and 59 of the

Federal Rules of Civil Procedure.   (Docket No. 170.)   Second, Anello moves for

attorneys' fees and costs under Rule 54 and 42 U.S.C. §§ 1983, 1988.   (Docket No.

159.)  Finally, Anello submits a Bill of Costs.  (Docket No. 168.)

---

[1]Defendant Robert Anderson, Jr., passed away on November 25, 2015.  His death has been suggested
on the record pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure.  (Docket No. 183.)

For the reasons set forth below, Defendants' motion is granted in part and denied in part; Anello's motion for attorneys' fees is granted, but with a reduced fee award; and Anello's Bill of Costs is granted, but with a reduced costs award.

## II. BACKGROUND

On October 22, 2007, Anello attended the Niagara Falls City Council meeting and registered to speak during the "good of the community" segment.  (Trial Transcript Volume 1 ("Tr. Vol. 1"), Docket No. 162, at 96, 103, 109; Trial Transcript Volume 2 ("Tr. Vol. 2"), Docket No. 163, at 307.)  During that portion of the meeting, each speaker was allotted five minutes to speak on any topic pertaining to the good of the community that was not listed as a specific agenda item.  (Tr. Vol. 1 at 102; Tr. Vol. 2 at 340, 341.)

Anderson was the chairman of the city council and presided over the October 22, 2007 meeting.  (Tr. Vol. 2 at 338.)  Fruscione and Robins were both sitting councilmen and present at the October 22, 2007 meeting.  (Tr. Vol. 1 at 208, 223; Tr. Vol. 2 at 293-94, 329-30.)

Anello is an Italian-American, born in Sicily.  (Tr. Vol. 2 at 375.)  He attended the October 22, 2007 city council meeting for the specific purpose of speaking out against Anderson, whom Anello had heard from three different sources had been making disparaging comments about Italians.  (Tr. Vol. 2 at 380-81, 383, 410-11, 416.)  When his turn came, Anello went to the podium and read from prepared remarks.  (Tr. Vol. 2 at 384, 385.)  Anello's remarks and what ensued was recorded on video, which was shown to the jury multiple times during the trial.

Anello began his remarks by acknowledging Anderson, the council members, and his fellow citizens.  (Tr. Vol. 2 at 390.)   He then read the title of his remarks: "Guineas and Greaseballs: Where There's Smoke There's Fire."  (Tr. Vol. 1 at 109, 110, 127; Tr. Vol. 2 at 390.)  In a calm, direct, and non-threatening manner, Anello read from his prepared script:

> I've titled this little presentation—Mr. Chairman, members of the council, fellow citizens—I've titled this presentation "Guineas and Greaseballs," sub-titled "Where There is Smoke There is Fire." My intention was to send this statement to the *Gazette* and to the *Buffalo News* to let it be written in their respective opinion pages. I've been going back and forth in my mind trying to decide what to do. I finally decided that I need to present this to the council and to the citizens of Niagara Falls in this setting because I believe that it is important enough that it be heard from me directly. I don't want to hide, as some do, in the security they feel when they make statements about others to reporters, or send articles to be written in the opinion pages. There is nothing wrong with this, but it is cowardly, as the person against whom the statement is made cannot defend him or herself. Three times in the past few weeks, different people recounted incidences to me during which Council Chairman Robert Anderson displayed, if these incidences are true, his ignorance in how he, as a councilman or as a person, regards Italians. I want to reiterate: these scenarios came to me during casual conversation and only Mr. Anderson, God, and the people who heard him can know whether or not they are true. If true, and I believe they are, these occurrences in which he aimed his ignorance towards Italians are shameful . . .

(Video of October 22, 2007 Niagara Falls City Council Meeting ("Video"), Declaration of Joseph Brown, Exhibit F, Docket No. 32-2, at :00 to 1:38[2]; Tr. Vol. 1 at 152, 215, 294, 342-43.)

---

[2]The video is maintained in the Clerk's Office of the Western District of New York.

At that point, before he was finished, Anello heard noise coming from the council dais.  (Tr. Vol. 2 at 390-91.)  Because he knew that his time had not expired, Anello interrupted his remarks to declare that he "had the floor."   (Tr. Vol. 2 at 390-91.) Anderson then said, "No, you don't have the floor." (Tr. Vol. 1 at 131; Tr. Vol. 2 at 308, 367, 421.)  But Anello refused to yield, which prompted Anderson to rise and signal Officer Franco Tallarico, a Niagara Falls police officer, to approach Anello.  (Tr. Vol. 1 at 128-30, 196-97, 200; Tr. Vol. 2 at 350-51, 423.)   Anello kept speaking, which then caused Robins to reach in front of Anderson and bang the chairman's gavel three times. (Tr. Vol. 2 at 308, 339, 352.)  Undeterred, Anello continued to speak. (Tr. Vol. 2 at 314, 331, 421-22.)

Meanwhile, Fruscione testified that he was taken aback when he heard Anello speak the initial words "guineas" and "greaseballs."  (Tr. Vol. 1 at 218-19.)  He stopped listening to Anello at that point and thought that Anello was referring to himself and another councilman, both Italian-Americans, as a "guinea" and a "greaseball."  (Tr. Vol. 1 at 252; Tr. Vol. 2 at 282-84.)  Fearing that more disparaging comments were to come, Fruscione turned off the switch to the microphone recording Anello's remarks for later broadcast over a local cable television education channel, which was played in city schools.  (Tr. Vol. 1 at 227; Tr. Vol. 2 at 278.)  Fruscione did not tell anyone that he turned off the switch.  (Tr. Vol. 1 at 227.)  Turning off the recording microphone did not affect the amplification in the chamber, nor did it stop Anello from speaking.  (Tr. Vol. 1 at 226-27.)

Once Officer Tallarico reached Anello, he repeatedly told him that he had to stop speaking and step away from the podium.  (Tr. Vol. 1 at 197.)  Anello refused, insisting that he "had the floor."  (Tr. Vol. 1 at 197.)  Officer Tallarico then forcibly removed Anello from the council chamber in handcuffs and thereafter arrested him for resisting arrest and disorderly conduct.  (Tr. Vol. 2 at 396-99; 436-38.)  Anello never finished his remarks.  (Tr. Vol. 2 at 394.)

Anello testified that he felt "embarrassed," "abused," "bad," "terrible," "degraded," "humiliated," and "like scum" after this incident.  (Tr. Vol. 2 at 398, 399, 400.)  He described the emotional toll this incident took on him as follows.

> I mean, not only - - not only did - - did this demean me with my friends and with people that  . . . that would know me in the city, my family has to - - has to - - listen to all this, see all this, be part of all this.  It's - - it's demeaning, and it's just something that I wish I had never lived through.  I hope to God none of you live through.

(Tr. Vol. 2 at 402-03.)

As far as his reputation in the community, Anello testified that

> It's not a nice thing when people greet you, you know, jailbird, convict, things of that nature.  It's not the way that I want to be greeted, and it's not the way I would want to greet anybody.  Yes, that made me feel also degraded.
> . . .
>
> People were treating me as a joke. . . You know, a lot of - - a lot of ribbing and name calling.  I run a small business. People come into the shop to make wine, and they walk in the door, and their greeting is not, "Good Morning, Matteo," it's, "Good morning, jailbird."  Who wants to - - you know, who wants to be addressed that way?

(Tr. Vol. 2 at 403-04.)

5

After this incident, Anello stopped attending council meetings, because he thought that Defendants would prevent him from participating. (Tr. Vol. 2 at 400, 405-406.) He had previously attended six to eight council meetings a year for the past 20 years or so. (Tr. Vol. 2 at 417.) Anello also stopped volunteering on community boards and he discontinued his partnership in Leadership Niagara, a community service organization. (Tr. Vol. 2 at 401-02.)

Anello's son (also named Matteo Anello) testified consistent with his father concerning the effect this incident had on him, including that Anello became more introverted and his interest in public affairs "took a negative hit." (Tr. Vol. 2 at 445, 447, 448, 450, 451.)

## III. DISCUSSION

### A. Defendants' Motion for Judgment as a Matter of Law and for a New Trial

Defendants seek judgment as a matter of law or a new trial. They argue that (1) neither Fruscione nor Robins violated Anello's First Amendment rights, (2) each defendant is entitled to qualified immunity, (3) the compensatory damages award is excessive, and (4) the punitive damages award is unwarranted and excessive. Each argument is addressed in turn.

#### 1. Legal Standards

Rule 50(a)(1) of the Federal Rules of Civil Procedure permits a court to render judgment as a matter of law and vacate a jury's verdict if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis" to reach its conclusion. The standard is well settled:

> Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in h[is] favor. In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence.

Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (internal citations omitted).  Indeed, the standard for post-verdict judgment as a matter of law is the same as that for summary judgment under Federal Rule of Civil Procedure 56.  Nadel v. Isaksson, 321 F.3d 266, 272 (2d Cir. 2003) (citing This Is Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998)).  Thus, a district court must deny a motion for judgment as a matter of law unless "there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.'"  Id. (quoting Cruz v. Local Union No. Three of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994)).

The moving party must, however, fulfill the procedural prerequisite of moving for judgment as a matter of law before the case is submitted to the jury.  See Fed. R. Civ. P. 50(a)(2).  And a party may only make a post-judgment Rule 50(b) motion based on grounds specifically raised at the close of evidence.  Lambert v. Genesee Hosp., 10 F.3d 46, 53–54 (2d Cir. 1993).  If the movant does not meet the Rule 50 specificity requirement, the court may not grant judgment as a matter of law unless the result is "required to prevent manifest injustice."  Kuper v. Empire Blue Cross & Blue Shield, No. 99 Civ. 1190, 2003 WL 359462, at *4 (S.D.N.Y. Feb. 18, 2003) (citing Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 287 (2d Cir. 1998)).

The standard under Rule 59, which permits a court to "grant a new trial on all or some of the issues," see Fed. R. Civ. P. 59(a)(1), is less stringent. See Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003). "In contrast to a judgment as a matter of law, a new trial may be granted under Rule 59 even if there is substantial evidence to support the jury's verdict." Mono v. Peter Pan Bus Lines, Inc., 13 F. Supp. 2d 471, 475 (S.D.N.Y. 1998) (citing Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)). And the court need not weigh the evidence in a light most favorable to the non-moving party. Song, 957 F.2d at 1047. Nevertheless, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Townsend v. Benjamin Enters., Inc., 679 F.3d 41, 51 (2d Cir. 2012) (internal citations and quotation marks omitted) (quoting Medforms, Inc. v. Healthcare Mgmt. Sols., Inc., 290 F.3d 98, 106 (2d Cir. 2002)).

### 2.     Fruscione and Robins

Defendants Fruscione and Robins argue that they are entitled to judgment as a matter of law because the facts adduced at trial demonstrate that they did not violate Anello's First Amendment Rights.

"Under the prevailing constitutional framework, speech restrictions imposed by the government on property that it owns are analyzed under a 'forum based approach.'" Hotel Emps. & Rest. Emps. Union, Local 100 & Vicinity, AFL CIO v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 544 (2d Cir. 2002) (quoting Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S. Ct. 2701, 120 L. Ed. 2d 541

(1992)). A "limited" public forum exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." Travis v. Owego–Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir. 1991).

Here, because the City of Niagara Falls invited public discourse on two limited subjects—agenda items and the good of the community—the city council meeting was a limited public forum for purposes of the First Amendment.  See Devine v. Vill. of Port Jefferson, 849 F. Supp. 185, 189 (E.D.N.Y. 1994) (council meeting is a limited public forum).

"'[I]n a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.'" Hotel Emps., 311 F.3d at 545-46 (quoting Travis, 927 F.3d at 692).  As for speech falling outside the specified categories for which the forum has been opened, "restrictions need only be viewpoint neutral and reasonable."  Hotel Emps., 311 F.3d at 46.  But the government may not, even in a limited forum, "regulat[e] speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700 (1995).

Fruscione argues that he did not violate Anello's First Amendment right to free speech.  The only action Fruscione took in relation to Anello's remarks was to turn off the microphone that was recording the proceedings for later broadcast over a local

9

cable television education channel.  (Tr. Vol. 1 at 227; Tr. Vol. 2 at 278.)  It is undisputed that turning off this microphone did not affect the amplification of Anello's remarks in the chamber nor did it stop Anello from speaking.  (Tr. Vol. 1 at 226.)  In fact, no one knew at the time that Fruscione had turned off the recording microphone.  (Tr. Vol. 1 at 227.)  At no time did Fruscione prevent Anello from speaking or continuing to speak.  (Tr. Vol. 1 at 222, 245-46, 249-50.)

When this Court denied Fruscione's motion for summary judgment, it did so based on its understanding that Fruscione admitted that he turned off Anello's microphone.  See Anello v. City of Niagara Falls, No. 09-CV-715S, 2012 WL 2847615, at *5 (W.D.N.Y. July 11, 2012).  What was not apparent was that Fruscione turned off only the recording microphone, not the microphone used for amplification in the chamber.  The trial evidence has now established that Fruscione's conduct did not infringe Anello's First Amendment rights in any way, since Anello has no First Amendment right to have his remarks recorded for later broadcast over a cable television station.

Thus, even viewing the trial evidence in the light most favorable to Anello, there is insufficient evidence to permit a reasonable jury to find in his favor against Fruscione. Fruscione's act of turning off the recording microphone, no matter what the motivation, did not prevent Anello from speaking, did not restrict Anello's speech in any way, and did not otherwise impact Anello's ability to relay his remarks during the council meeting. No evidence was presented that Anello even knew his remarks were being recorded or that he spoke that evening with the specific intent of having his remarks recorded and

broadcast over the cable television station.  In short, Anello presented no evidence that Fruscione acted to restrict or curtail his speech.  Fruscione is therefore entitled to judgment as a matter of law on Anello's First Amendment claim and he will be dismissed from this suit.

Like Fruscione, Robins argues that he is entitled to judgment as a matter of law, because his conduct did not violate Anello's First Amendment right to free speech. Robins is the councilman who banged the chairman's gavel three times in an effort to stop Anello from speaking.  (Tr. Vol. 2 at 308, 339.)  Robins testified that as chairman, it was Anderson's job, not his, to use the gavel during the council meetings.  (Tr. Vol. 2 at 294.)  Nevertheless, Robins took it upon himself to reach for and use the gavel in an effort to silence Anello, because Robins did not like the words Anello used and he felt that Anello was attacking council members.  (Tr. Vol. 2 at 295, 310-11.)  Robins testified that he used the gavel to halt what he believed to be Anello's personal attack on Anderson and to restore order in the chamber after Anello refused to abide by Anderson's directive to stop speaking.  (Tr. Vol. 2 at 310-11,314-15, 320, 322, 331.)

Robins maintains that he is entitled to judgment as a matter of law because he did not use the gavel until after Anderson had declared Anello out of order and he did not possess the authority to stop Anello from speaking.  He also maintains that Anello did not stop speaking after he used the gavel and therefore it is "undisputed" that he did not chill Anello's right to free speech.  Robins's arguments are unpersuasive.

Viewed in the light most favorable to Anello, sufficient evidence was presented at trial to permit a reasonable jury to find that Robins violated Anello's right to free speech.

Unlike Fruscione, the jury could reasonably have found that Robins acted directly to restrict or stop Anello's speech by banging the gavel.  It is of no moment that Robins lacked procedural authority under the council's rules to use the gavel; the jury could nonetheless have found him to be a state actor impinging Anello's First Amendment rights.

Based on the trial evidence, the jury could reasonably have found that Robins intervened contemporaneously with Anderson to silence Anello due to the "specific motivating ideology or the opinion or perspective of the speaker."  Rosenberger, 515 U.S. at 829.  While Robins seeks to have his conduct viewed in a vacuum, the evidence at trial could reasonably be viewed as proving that Robins joined Anderson's efforts to silence Anello and furthered those efforts by banging the gavel.  According to Robins's own testimony, he sought to silence Anello because Anello was attacking Anderson (Tr. Vol. 2 at 310-11) and was using what Robins viewed as racial slurs (Tr. Vol. 2 at 295).

But contrary to Robins's characterization of Anello's remarks as "using racial slurs," the jury heard evidence that Anello was *not* using the terms as racial slurs, but rather, was simply identifying the derogatory terms that Anello understood Anderson to be using in the community.  (Tr. Vol. 1 at 112; Tr. Vol. 2 at 381, 383, 410-11.)  Even Anderson admitted as much, testifying that he understood Anello's remarks to be accusing him of saying negative things about the Italian community.  (Tr. Vol. 2 at 349.)  And although it is true that Anello did not stop speaking in response to Robins's use of the gavel, the jury could reasonably have concluded that Robins nevertheless infringed on Anello's right to free speech by restricting and interrupting his remarks and joining in

Anderson's directives and eventually successful efforts to silence him by banging the gavel. Thus, viewed in the light most favorable to Anello, sufficient evidence was presented at trial for the jury to find that Robins violated his free speech rights. Robins is therefore not entitled to judgment as a matter of law.

### 3. Qualified Immunity

Fruscione, Robins, and Anderson argue that, even assuming that Anello suffered a First Amendment deprivation, they are entitled to qualified immunity. At trial, the jury rejected Defendants' qualified immunity defenses. (Docket No. 157.)

Officials are protected from § 1983 liability on the basis of qualified immunity if (1) their actions did not violate clearly established law, or (2) it was objectively reasonable for them to believe that their actions did not violate the law. See Warren v. Keane, 196 F.3d 330, 332 (2d Cir. 1999). It is clearly established law that in a limited public forum, the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).

For the reasons already stated, Fruscione would be entitled to qualified immunity, because his act of turning off the recording microphone did not violate any clearly established law. Again, Anello has no First Amendment right to have his public speech recorded for later broadcast over a cable television station. Thus, Fruscione would be entitled to qualified immunity.

Robins argues that he is entitled to qualified immunity because he banged the gavel after Anderson declared that Anello no longer had the floor and that he did so with

no intent to stop Anello from speaking. He further asserts that he is entitled to qualified immunity because it was not clearly established that "merely banging a gavel," with no other action, violates the First Amendment.

Again, however, Robins minimizes his role and assumes the evidence in the light most favorable to him, not in the light most favorable to Anello, as is required on this motion. As explained above, the jury could reasonably have concluded that Robins and Anderson acted contemporaneously and together in attempting to silence Anello. Further, although Robins testified that he did not intend to silence Anello (Tr. Vol. 2 at 326), he also testified that he banged the gavel to stop Anello from personally attacking council members and to restore order, both of which could occur only by silencing Anello, (Tr. Vol. 2 at 310-11, 314-15, 320, 331). The jury also heard Officer Tallarico testify that he understood Robins's banging of the gavel to mean that Anello's time to speak was concluded and he had to sit down and stop speaking. (Tr. Vol. 1 at 136-38.) The jury could reasonably have viewed this evidence, in light of the clearly established First Amendment standard, and concluded that it was not objectively reasonable for Robins to believe that his actions did not violate the law. Consequently, Robins is not entitled to qualified immunity.

Anderson asserts that he too is entitled to qualified immunity. His argument hinges almost entirely on his insistence that his decision to silence Anello was reasonable, because Anello used "vile and horrible" and "inflammatory" words, and Anderson had the discretion to ensure that the council meeting was conducted in an orderly and dignified fashion.

What Anderson ignores, however, is the evidence presented to the jury that Anello did not use the terms "guineas" and "greaseballs" in an offensive or inflammatory way, but rather, attributed the use of those words to Anderson, who Anello claimed had used them in derogatory reference to Italian-Americans.  Anello himself is an Italian-American.  (Tr. Vol. 2 at 375.)  He registered to speak at the council meeting because he thought it important for the good of the community that it be known that Anderson was using the slurs "guinea" and "greaseball" in reference to Italian-Americans.  (Tr. Vol. 2 at 381, 383, 410-11, 416.)  And contrary to Anderson's characterization that Anello was disruptive, witnesses testified that Anello spoke in a calm, direct, non-threatening manner.  (Tr. Vol. 1 at 152, 215; Tr. Vol. 2 at 294, 342-43.)

From the context of Anello's remarks and considering his own Italian-American heritage, the jury could reasonably have found that Anello opposed the use of these derogatory terms, not that he was using them inappropriately or offensively.  (Tr. Vol. 1 at 112.)  For example, Officer Tallarico testified that he understood Anello's remarks to concern Anderson's ignorance toward Italian-Americans.  (Tr. Vol. 1 at 142-43, 145.)  And Anderson himself testified that he understood Anello's remarks to be discrediting him and accusing him of using these terms to refer to the Italian-American community.  (Tr. Vol. 2 at 349, 353-54.)  Anderson further testified that he told Anello that he "no longer had the floor" because Anello "kept going on and on and on about the same negative stuff."  (Tr. Vol. 2 at 367.)  Anderson explained that by "negative stuff," he meant Anello's "personal attack" on him.  (Tr. Vol. 2 at 367.)  In other words, Anderson did not like the content of Anello's speech.

Thus, the jury heard sufficient evidence to conclude that it was the viewpoint, content, and perspective of Anello's remarks that prompted Anderson to silence him, not simply Anderson's benign desire to maintain decorum as chairman of the council. And because it is clearly established that the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," Anderson is not entitled to qualified immunity. Rosenberger, 515 U.S. at 829.

### 4. Compensatory Damages

Defendants argue that the compensatory damages award, which is now reduced to $20,000 with the dismissal of Fruscione, is excessive and requires remittitur to the nominal amount of $1.

"A jury has broad discretion in measuring damages," Dotson v. City of Syracuse, No. 5:04-CV-1388 NAM/GJD, 2011 WL 817499, at * 13 (N.D.N.Y. Mar. 2, 2011), but "there must be an upper limit, and whether that has been surpassed is . . . a question of law," Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 435, 116 S. Ct. 2211, 2223, 135 L. Ed. 2d 659 (1996) (quoting Dagnello v. Long Island R.R. Co., 289 F.2d 797, 806 (2d Cir. 1961). If a court finds that the limit has been eclipsed, and that the damages are excessive, it may order a new trial, a new trial limited to damages, or remittitur. Thorsen v. County of Nassau, No. CV 03-1022, 2010 WL 2671816, at * 11 (S.D.N.Y. 2010) (citing Cross v. N.Y. City Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005)).

Remittitur, "a limited exception to the sanctity of jury fact-finding", see Akermanis v. Sea-Land Serv., Inc., 688 F.2d 898, 902 (2d Cir.1982), "is the process by which a

court compels a plaintiff to choose between reduction of an excessive verdict and a new trial," Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990) (quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir. 1984)).  It is appropriate where "a properly instructed jury, hearing properly admitted evidence, nevertheless makes an excessive award."  Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd., 930 F.2d 1021, 1027 (2d Cir. 1991) (quoting Shu-Tao Lin, 742 F.2d at 50).  A court's decision to compel such a choice depends on whether the jury's award is "so high as to shock the judicial conscience and constitute a denial of justice."  Payne v. Jones, 711 F.3d 85, 96 (2d Cir. 2012) (quoting  Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978)).

Defendants first argue that a $20,000 award is excessive because Anello cannot recover "damages based on the abstract 'value' or 'importance' of constitutional rights," which is correct.  Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 310, 106 S.Ct. 2537, 2545, 91 L.Ed.2d 249 (1986).  But Anello testified that he suffered emotional damages and damage to his reputation.  He stated that he felt "embarrassed," "abused," "bad," "terrible," "degraded," humiliated," and "like scum."  (Tr. Vol. 2 at 398, 399, 400.)  And Anello's son testified that Anello "took a negative hit" from this incident and became more introverted, unmotivated, and depressed.  (Tr. Vol. 2 at 450, 451.)  Anello is permitted to recover for these damages.  See Patrolmen's Benevolent Ass'n. of City of New York v. City of New York, 310 F.3d 43, 55 (2d Cir. 2002) (reasoning that compensatory damages for emotional distress are permitted under § 1983 when substantiated by evidence in addition to a plaintiff's subjective testimony, such as by

witnesses to the plaintiff's distress or by the objective circumstances of the violation itself).  Thus, this is not a case where recovery is sought solely on the value of the constitutional right.

Defendants next argue that the jury's compensatory damages award cannot stand, because this Court erred in permitting Anello to introduce evidence concerning his arrest, which Defendants peg as the sole cause of Anello's injuries.  In particular, Defendants contend that this Court erred in permitting Anello to introduce the entire video of the incident in question and by not giving the jury a curative instruction.  But as this Court explained at trial, Defendant's view of causation in this case is too cabined. Having heard the trial evidence, the jury could reasonably have found that Anderson's and Robins's conduct caused Officer Tallarico to stop Anello from speaking and forcibly remove him from the chamber in violation of Anello's First Amendment rights.  Stated differently, Anderson and Robins wrongfully caused Officer Tallarico to engage with Anello.  In this continuum, Anello's theory of compensatory damages as proximately caused by Defendants was sufficient for submission to the jury.  This argument therefore does not warrant a new trial or remittitur of the compensatory damages award.

Third, Defendants argue that the compensatory damages award fails to reflect separate consideration of each individual defendant by the jury.  This argument is wholly speculative.  This Court specifically instructed the jury to consider each defendant individually, and a jury is presumed to follow a court's instruction.  See, e.g., TradeCard, Inc. v. S1 Corp., 509 F. Supp. 2d 304, 327 (S.D.N.Y. 2007) ("Courts are entitled to presume that the jury followed the instructions given to it.").  The jury heard

detailed evidence concerning each defendant's role in this incident and nothing in the jury's award suggests that it failed to consider each defendant individually as instructed.

Finally, this Court cannot conclude as a matter of law that the jury's compensatory damages award of $10,000 per each defendant is "so high as to shock the judicial conscience and constitute a denial of justice." Payne, 711 F.3d at 96. One of the most concrete methods used to determine whether an award "shocks the judicial conscience, is to "consider[ ] . . . the amounts awarded in other, comparable cases." DiSorbo v. Hoy, 343 F.3d 172, 183 (2d Cir. 2003).

Emotional distress awards within the Second Circuit can "generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'" See, e.g., Olsen v. County of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009); Mugavero v. Arms Acres, Inc., 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010). In "garden variety" emotional distress cases, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." Khan v. Hip Centralized Lab. Servs., Inc., No. CV-03-2411, 2008 WL 4283348, at *11. "Garden variety" emotional distress claims "generally merit $30,000 to $125,000 awards." Mugavero, 680 F. Supp. 2d at 578.

The evidence presented at trial reflects "garden variety" emotional distress. For example, Anello testified that he felt "embarrassed," "abused," "bad," "terrible," "degraded," "humiliated," and "like scum" after this incident. (Tr. Vol. 2 at 398, 399, 400.) He described the emotional toll this incident took on him as follows.

> I mean, not only - - not only did - - did this demean me with my friends and with people that  . . . that would know me in the city, my family has to - - has to - - listen to all this, see all this, be part of all this.  It's - - it's demeaning, and it's just something that I wish I had never lived through.  I hope to God none of you live through.

(Tr. Vol. 2 at 402-03.)

As far as his reputation in the community, Anello testified that

> It's not a nice thing when people greet you, you know, jailbird, convict, things of that nature.  It's not the way that I want to be greeted, and it's not the way I would want to greet anybody.  Yes, that made me feel also degraded.
> . . .
>
> People were treating me as a joke. . . You know, a lot of - - a lot of ribbing and name calling.  I run a small business.  People come into the shop to make wine, and they walk in the door, and their greeting is not, "Good Morning, Matteo," it's, "Good morning, jailbird."  Who wants to - - you know, who wants to be addressed that way?

(Tr. Vol. 2 at 403-04.)

After this incident, Anello stopped attending council meetings, because he thought that the defendants would prevent him from participating.  (Tr. Vol. 2 at 400, 405-406.)  He had previously attended six to eight council meetings a year for the past 20 years or so.  (Tr. Vol. 2 at 417.)  Anello also stopped volunteering on community boards and he discontinued his partnership in Leadership Niagara, a community service organization.  (Tr. Vol. 2 at 401-02.)  Anello's son further testified that this incident caused Anello to become more introverted and his interest in public affairs "took a negative hit."  (Tr. Vol. 2 at 445, 447, 448, 450, 451.)

20

Based on this evidence, it cannot be concluded that a $20,000 compensatory damage award, which falls below the typical range of recovery for "garden variety" emotional distress damages, is "so high as to shock the judicial conscience and constitute a denial of justice." Payne, 711 F.3d at 96. Defendants' motion for a new trial on compensatory damages or for remittitur of compensatory damages is therefore denied.

### 5.    Punitive Damages

Last, Defendants seek remittitur or a new trial on punitive damages. Defendants claim that the now $50,000 punitive award is excessive and should be set aside. This Court agrees.

"Awards of punitive damages are by nature speculative, arbitrary approximations." Id. at 93. Nonetheless, courts have an obligation to ensure that such awards are "fair, reasonable, predictable, and proportionate." Id. Judicial review of punitive damages awards, in fact, "has been a safeguard against excessive verdicts for as long as punitive damages have been awarded." Id. at 96 (citing Honda Motor Co. v. Oberg, 512 U.S. 415, 421, 114 S. Ct. 2331, 129 L. Ed. 2d 336 (1994)).

 A court's authority to limit an award derives in part from the Due Process Clause of the Fourteenth Amendment. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 433, 121 S. Ct. 1678, 1683, 149 L. Ed. 2d 674 (2001). When a federal court reviews a state-court award, punitive damages violate the Due Process Clause if they are "grossly excessive." Id.; BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996). But a federal trial court reviewing its own jury's verdict

for excessiveness has an independent "supervisory authority."  Payne, 711 F.3d at 97.

Therefore, "a degree of excessiveness less extreme than 'grossly excessive' will justify"

remittitur in cases such as this.  Id.

The three guideposts articulated by the Supreme Court in Gore inform this

inquiry. 517 U.S. at 574–75.  Those guideposts are: (1) degree of reprehensibility of the

defendant's conduct; (2) relationship of the punitive damages to the compensatory

damages; and (3) disparity between the punitive damages award and penalties imposed

in comparable cases.  Id.; Payne, 711 F.3d at 101.

The degree of reprehensibility of the defendant's misconduct is "[p]erhaps the

most important indicum of the reasonableness of a punitive damages award." Gore, 517

U.S. at 575.   "This guidepost is particularly important and useful because punitive

damages are intended to punish, and the severity of punishment, as in the case of

criminal punishments, should vary with the degree of reprehensibility of the conduct

being punished." Payne, 711 F.3d at 101.

The Supreme Court has outlined five factors relevant to determining the

reprehensibility of a defendant's conduct.   State Farm Mut. Auto. Ins. Co. v. Campbell,

538 U.S. 408, 419, 123 S. Ct. 1513, 1521, 155 L. Ed. 2d 585 (2003).   Courts should

consider whether:

> the harm caused was physical as opposed to economic; the
> tortious conduct evinced an indifference to or a reckless
> disregard of the health or safety of others; the target of the
> conduct had financial vulnerability; the conduct involved
> repeated actions or was an isolated incident; and the harm
> was the result of intentional malice, trickery, or deceit, or
> mere accident.

Id.

The First Amendment violation here, while serious, cannot be cataloged as reprehensible.  Although Defendants demonstrated indifference to or reckless disregard of well-settled principles of free speech, they did not evince an indifference to anyone's health or safety.  From the evidence, the jury could reasonably have concluded that Anderson and Robins silenced Anello due to the content of his speech, the very hallmark of a First Amendment violation.  This was an isolated incident and there was no evidence of malice toward Anello beyond Anderson and Robins not agreeing with his viewpoint.  Thus, while the jury could reasonably conclude that Anderson and Robins blatantly violated Anello's First Amendment rights, it cannot be said that their conduct was particularly reprehensible, deceitful, or the like.

The next factor is proportionality.  "Courts must ensure that the measure of punishment is both reasonable and *proportionate* to the amount of harm to the plaintiff and to the general damages recovered."  State Farm, 538 U.S. at 426 (emphasis added).  This factor—the ratio between the punitive and compensatory damages—is the "most commonly cited indicum of an unreasonable or excessive punitive damages award."  Gore, 517 U.S. at 580.  A bright-line test, however, is inappropriate, see id. at 582–83, as "it is difficult or impossible to make useful generalizations," Payne, 711 F.3d at 102.  But "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process."  State Farm, 538 U.S. at 425.

The jury awarded Anello a total of $50,000 in punitive damages and $20,000 in compensatory damages, resulting in a ratio of 2.5 to 1.  Under the circumstances of this

23

case, this is excessive. As such, a reduction in the punitive damages award is necessary to achieve greater proportion to the harm that Defendants caused.

The third, and arguably least important, guidepost assesses the "disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" State Farm, 538 U.S. at 428 (quoting Gore, 517 U.S. at 575). Anello has not come forward with any comparable First Amendment cases imposing punitive damages in a 2.5 to 1 ratio. Accordingly, this factor also suggests that the award should be reduced.

Considering the totality of the circumstances, including the limited degree of reprehensibility, the singular nature of the violation, the compensatory award, and the ultimate purpose of punitive damages—to punish and deter future misconduct—this Court finds that remittitur is warranted. Specifically, this Court finds that a $10,000 punitive damages award against each defendant (for a total of $20,000 in punitive damages), resulting in a 1 to 1 ratio, sufficiently preserves and respects the jury's determination that punitive damages are needed to punish and deter Defendants from engaging in future First Amendment violations while not being excessive. If Anello does not accept this remittitur, this Court will vacate the punitive damages award and conduct a new trial limited to the question of punitive damages. See iStar, 652 F.3d at 145–47 ("[T]his Court has . . . provided plaintiffs with the option of a new trial [] where a punitive damages award has been deemed excessive"); Vasbinder v. Scott, 976 F.2d 118, 122–23 (2d Cir. 1992).

**B.    Anello's Motion for Attorneys' Fees**

Anello seeks attorneys' fees in the total amount of $278,434.   Defendants vigorously oppose this request.

To ensure that federal rights are adequately enforced, a prevailing party in a civil rights action may recover, subject to the court's discretion, "a reasonable attorney's fee." See 42 U.S.C. § 1988; Perdue v. Kenny A. ex rel. Winn, 130 S. Ct. 1662, 1671, 176 L. Ed. 2d 494 (2010).   This involves a two-step process.   First, the court must determine whether the party seeking fees is a prevailing party.   See Pino v. Locascio, 101 F.3d 235, 237 (2d Cir. 1996).   If so, the court must then assess whether the requested fee is reasonable.   See id.   "A 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." Perdue, 130 S.Ct. at 1672.

In this circuit, if a court finds a fee award to be appropriate, it will set a "reasonable hourly rate," bearing in mind all the case-specific variables.   Adorno v. Port Auth. of N.Y. & N.J, 685 F. Supp. 2d 507, 510-11 (S.D.N.Y. 2010) (quoting Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany, 522 F.3d 182, 190 (2d Cir. 2008)).   Those variables include the twelve Johnson factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case;  (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience,

25

reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  See Arbor Hill, 522 F.3d at 190 (citing Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)).  After determining the reasonable hourly rate, the court uses it to calculate the presumptively reasonable fee by multiplying the rate by the number of hours reasonably expended.  Id.

Here, despite Defendants' arguments to the contrary, Anello is clearly a prevailing party.  A party is a prevailing party if the party "succeeds on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Farrar v. Hobby, 506 U.S. 103, 109 (1992).  Anello unquestionably succeeded on his First Amendment claim against Anderson and Robins, which was, of course, the significant issue in this litigation.   While Defendants question Anello's degree of success—they refuse to recognize that Anello's successful prosecution of his First Amendment rights significantly advanced the public interest—and correctly note that certain defendants and claims were dismissed before trial, Anello is nonetheless the prevailing party for purposes of § 1988 and is therefore entitled to recover attorney fees. See Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) ("a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust"); Balu v. City of New York, No. 12 Civ. 1071 (KPF), 2016 WL 884666, at *6 (S.D.N.Y. Mar. 8, 2016) (noting that reduction in attorney's fees is not required when successful and unsuccessful claims were interrelated and required essentially the same proof).

But for a variety of reasons, Anello's fee request is unreasonable.

The first issue is the reasonableness of the hourly rates claimed.  Anello claims an hourly rate of $250 per hour for trial counsel Jeanne M. Vinal, Esq.; $225 per hour for Louis H. Siegel, Esq., who assisted Jeanne M. Vinal; and $200 for Matthew P. Pynn, Esq., who was Plaintiff's first attorney.  (Declaration of Jeanne M. Vinal, Esq. ("Vinal Decl."), Docket No. 159-1, ¶¶ 5, 7; Declaration of Louis H. Siegel, Esq. (Siegel Decl."), Docket No. 166, ¶ 4.)  There is no material dispute concerning the reasonableness of these rates.

But Anello has not submitted hourly rates for the other legal professionals that he claims worked on his case, including Gregg S. Maxwell, Esq., Greg M. Vinal, Esq., Brian T. Cook, Esq., and two paralegals.  See Savoie v. Merchants Bank, 166 F.3d 456, 463 (2d Cir. 1999) (noting that the fee-seeking party bears the burden of "establishing entitlement to an award and documenting the appropriate hours expended and hourly rates").   Nor has Anello submitted any meaningful information concerning the experience of these professionals, beyond noting that Maxwell and Greg Vinal graduated from law school in 1989, and Cook was an associate at Vinal & Vinal.  (Vinal Decl., ¶ 21.)   The firm's website lists Greg Vinal as a partner and Maxwell as an associate.  Given this lack of information, this Court will apply a rate of $225 per hour for Greg Vinal; $175 per hour for Maxwell; $150 for Cook; and $75 for the two paralegals.  See Cold Spring Const. Co. v. Spikes, No. 11-CV-700S, 2013 WL 5295654, at *3 (W.D.N.Y. Sept. 18, 2013) (assigning rates where no information was provided as to the experience and skill of the professionals who worked on the matter); Glenn v. Fuji Grill

Niagara Falls, LLC, 14-CV-380S, 2016 WL 1557751, at *7 (W.D.N.Y. Apr. 18, 2016) (finding $75 per hour for paralegal to be in line with the prevailing rate in the community).

The second issue is the reasonableness of the time expended. The party seeking attorney's fees must support the number of hours expended with "contemporaneous time records . . . [that] specify, for each attorney, the date, the hours expended, and the nature of the work done." N.Y.S. Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1147-48 (2d Cir. 1983). This Court must exclude any hours that were "excessive, redundant, or otherwise unnecessary." Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S. Ct. 1933, 76 L. Ed.2d 40 (1983). Indeed, all time must be reasonably expended. Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 111 (2d Cir. 2012). In making this determination, the court must ask whether the attorney exercised "billing judgment." See Anderson v. Rochester–Genesee Reg'l Transp. Auth., 388 F. Supp. 2d 159, 163 (W.D.N.Y. 2005).

But "the district court is not obligated to undertake a line-by-line review of [an] extensive fee application." Marion S. Mishkin Law Office v. Lopalo, 767 F.3d 144, 150 (2d Cir. 2014). Rather, the court may "use a percentage deduction as a practical means of trimming fat." McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 96 (2d Cir. 2006). In that regard, "[a] court has discretion to impose an across-the-board reduction if an attorney has billed excessive, redundant, or unnecessary hours." Kreisler v. Second Ave. Diner Corp., No. 10 Civ.

7592 (RJS), 2013 WL 3965247, at *3 (S.D.N.Y. July 31, 2013) (citation omitted). Across-the-board cuts may also be imposed for vague billing entries.  See id.

Defendants have filed a lengthy submission highlighting the various deficiencies in Anello's fee request.  (See Declaration of Joseph S. Brown ("Brown Decl."), Docket No. 174.)  This submission details duplicative, vague, and impossible time entries; excessive time spent reviewing the video of the council meeting; excessive time spent on discovery tasks; excessive attorney time spent on routine clerical tasks; and claims for time spent on non-billable tasks.  Defendants also argue that Anello should not be awarded fees for responding to motions to compel and for litigation concerning Anello's failure to file appropriate pretrial submissions.

Several examples will demonstrate the across-the-board deficiencies in Anello's fee submission.  Vinal & Vinal billed 47.5 hours preparing for and attending 19 court conferences, two of which did not occur.  (Brown Decl., ¶¶ 9-12.)  For each conference, no matter what its purpose or duration, precisely 2.5 hours were billed.  (Id.)  And Vinal & Vinal billed 5.5 hours for reviewing the video of the incident 11 times, with each entry exactly .5 hours.  (Id. ¶ 13.)  Other instances of Vinal & Vinal billing the same exact amount of time for repetitive tasks on separate occasions include for research on parliamentarian issues (5 hours), truth as a legal defense (15 hours), slurs (12 hours), verdict searches (24 hours), and Roberts Rules of Order (17 hours).  (Id. ¶ 15.)  Vinal & Vinal also used "focus groups" to prepare for trial, billing 24 hours for 12 focus group sessions, each lasting precisely 2 hours over the course of three days.  (Id. ¶17.)  No explanation is provided for these unusually uniform entries.

Vinal & Vinal also billed an inordinate amount of time for discovery-related and routine tasks.  (Brown Decl., ¶¶ 23-43, 44–54.)  For example, it billed 17 hours to review five pages of documents relating to the parties' Rule 26 Initial Disclosures (id. ¶¶ 25–28), 42 hours to summarize deposition transcripts totaling only 350 pages (id. ¶¶ 35–43), .3 hours to write a one-sentence letter (id. ¶ 46), 1.8 hours to review a 2-page substitution of counsel filing (id. ¶ 47), 1.5 hours to review a one-page letter (id. ¶ 51), and 17.8 hours to file (not draft) an appellate brief (id. ¶ 55).  These are but a few examples.

Vinal & Vinal also seeks attorneys' fees for tasks related to its own inability to comply with the court's orders.  This includes 9.8 hours related to Defendants' Motion to Compel (Brown Decl., ¶¶ 19-22) and 85.8 hours related to Anello's compliance with this Court's pretrial orders (id. ¶¶ 59–73).

Anello's response to this litany of documented discrepancies is limited to defending the need to research First Amendment issues and blaming Defendants for engaging in litigation tactics that, in Anello's view, justify the billings.  (Declaration of Jeanne M. Vinal ("Vinal Decl."), Docket No. 181.)  None of the discrepancies identified above are specifically addressed, though it is admitted that "[w]e do not enter the time from time sheets into the computer contemporaneously, but we do use handwritten time sheets . . . we gave up our computer program for generating bills which we have previously used and therefore used an ordinary spreadsheet."  (Id. ¶ 7.)

Remarkably, Anello also represents that "Defendant [sic] offers no substantive arguments on any particular portion of Plaintiff's request for fees" and "Defendant's [sic]

30

. . . offer absolutely no examples or make any claims with regard to specific inclusions in our submission." (Plaintiff's Reply Memorandum of Law, Docket No. 182.)  This is astounding considering the 32-page Brown Declaration, which painstakingly details the failings of Anello's fee submission, as excerpted above.

Vinal & Vinal claim 844.9 hours of work by Jeanne Vinal; 91 hours by Greg Vinal; 96.6 hours by Maxwell; 5 hours by Cook; and 45.1 hours by paralegals.  This Court will reduce Jeanne Vinal's billings by 85.8 hours, to account for Vinal & Vinal's billings related to its own inability to comply with the court's orders.  It will also reduce Greg Vinal's billings by 19 hours, to account for duplication when both he and Louis H. Siegel, Esq. unnecessarily attended trial together for two days to "second chair" Jeanne M. Vinal.  This results in 759.1 hours for Jeanne M. Vinal and 72 hours for Greg M. Vinal.

Overall, this leaves Vinal & Vinal with 932.7 attorney hours (at their respective rates) and 45.1 paralegal hours, resulting in $227,012.50.  This amount must be further reduced to account for the unrebutted excessive, redundant, vague, and unnecessary time entries, and to account for attorney time unnecessarily spent on routine clerical and non-billable tasks.  In this Court's view, an additional 50% across-the-board reduction in hours is necessary to bring Vinal & Vinal's fee request into the realm of reasonableness. Vinal & Vinal will thus be awarded a fee of $113,506.25.  This fee is in addition to the $9,120 fee for Matthew P. Pynn (Docket No. 159-2) and the $5,625 fee for Louis H. Siegel (Siegel Decl., ¶¶ 4, 5), both of which this Court finds reasonable and sufficiently supported.  No interest is awarded on these fees.

In all, Defendants are responsible for Anello's attorneys' fees in the amount of $128,251.25 for this litigation that is now approaching its seventh anniversary.

## C.    Anello's Bill of Costs

Anello has submitted a Bill of Costs for $3,342.79.    (Docket No. 168.) Defendants oppose a majority of the request.  (Docket No. 178.)

The party seeking to recover costs bears the burden of adequately documenting and itemizing the costs requested.  Baker v. Power Sec. Corp., 174 F.R.D. 292, 294-95 (W.D.N.Y. 1997) ("The burden is therefore upon the party seeking costs to provide adequate documentation of its costs, and a failure to do so may result in the costs being reduced or denied.").  A party is not entitled to recover costs when its application fails to provide substantiation for the costs sought.  See Mendez v. Radec Corp., 907 F. Supp. 2d 353, 360 (W.D.N.Y. 2012) (denying costs that were "not adequately explained through Plaintiffs' submission"); Douyon v. N.Y. Med. Health Care, P.C., 49 F. Supp. 3d 328, 352 (E.D.N.Y. 2014) ("[W]ith this record, the Court has no way of confirming that these costs . . . were incurred by counsel."); Joe Hand Promotions, Inc. v. Elmore, No. 11–cv3761, 2013 WL 2352855, at *12 (E.D.N.Y. May 12, 2013) (declining to award costs due to an absence of documentation).

Anello seeks to recover $3,342.79 in costs, including $350 for the filing fee; $140[1] for service of summons and subpoena; $1,393.20 for transcripts; $114.30 for printing; $57.88 for witness fees; $121.61 for copies; $25 for docket fees; $690 for

---

[1] This $140 includes witness fees of $57.88, which is duplicative of Anello's separate claim for witness fees.

court-appointed experts; and $450.80 for "other costs."   Only a small portion of these costs are properly recoverable.

Anello may recover the $350 filing fee.   He may also recover for service of a subpoena, but only in the amount of $55, which is what the U.S. Marshal would have charged for service, not $140.   <u>See</u> <u>Document Sec. Sys., Inc. v. Coupon.com, Inc.</u>, No. 11-CV-6528 CJS, 2015 WL 1189551, at *2 (W.D.N.Y. Mar. 16, 2015) (finding that service costs cannot exceed those charged by the U.S. Marshal).   Anello is also entitled to recover his witness fee of $57.88.   Each of these costs is documented in the Bill of Costs.   (Docket No. 168.)

The remainder of Anello's Bill of Costs must, save one minor charge for copying costs, be disallowed.

First, Anello seeks $1,393.20 for transcripts.   This district's *Guidelines for Bill of Costs* ("the *Guidelines*"), which governs Bills of Cost under Rule 54 of the Local Rules of Civil Procedure for the Western District of New York, requires the following documentation (or explanation) to recover transcript costs:   the transcript prepared (or copied); the number of pages in the transcript; the per page rate; and the total cost of the transcript.

Here, Anello includes invoices totalling only $495.75.   Thus, $897.45 will be disallowed for complete lack of documentation.   As to the remaining $495.75, this Court finds that the documentation provided, which consists of two invoices that simply list the name of the deponent and the total cost of the transcript, is insufficient.   No information is provided concerning the number of pages in the transcript or the per-page rate, as

required by the *Guidelines*.  Consequently, no costs for transcripts will be permitted.

Second, Anello seeks $114.30 for printing costs.  The only documentation provided is an invoice for $129.36 relating to the printing of Anello's brief to the Second Circuit.  These costs, however, are only recoverable in the Second Circuit.  See Fed. R. App. P. 39(d).  Thus, no costs for printing will be allowed.

Third, Anello seeks $121.61 in copying costs.  These costs relate primarily to court PACER fees, which are not recoverable.  See Anderson Group, LLC v. City of Saratoga Springs, No. 1:05-CV-1369 (GLS), 2013 WL 160267, at *3 (N.D.N.Y. Jan. 15, 2013) (finding claim for PACER costs improper under 28 U.S.C. § 1920).  This Court will, however, permit recovery of $6.81 for copying Plaintiff's medical records, which is documented in the Bill of Costs.

Next, Anello seeks $25 for docket fees under 28 U.S.C. § 1923, but he does not identify the item docketed, as required by the *Guidelines*. This cost will therefore be disallowed.

Fifth, Anello seeks $690 for court-appointed experts.  The invoice in support of this claim lists $360 in mediation fees, which are not taxable as costs, as stated in the *Guidelines,* § 3.  Consequently, this cost will not be permitted.

Finally, Anello seeks $450.80 in "other costs," which, from the submitted documentation, include an unspecified attorney-admission fee of $216 and travel expenses of $234.80, neither of which are taxable as costs.  Both will therefore be

disallowed for lack of sufficient documentation and as barred under the *Guidelines,* § 3.

All told, Anello will be awarded costs in the amount of $469.69.

## IV.  CONCLUSION

As determined by the jury, Defendants Anderson and Robins violated Anello's First Amendment right to free speech.  For the reasons stated above, that determination is supported by the evidence adduced at trial and Defendants Anderson and Robins are not entitled to judgment as a matter of law or a new trial.  Defendant Fruscione, however, did not violate Anello's free speech rights.  He is therefore entitled to judgment as a matter of law and dismissal from this suit.

Anello also presented sufficient evidence supporting the jury's compensatory damages award of $10,000 per defendant.  The jury's punitive damages award, however, requires remittitur to $10,000 per defendant, for the reasons set forth above.

Finally, Anello is entitled to recover his reasonable attorneys' fees and costs, which for the reasons stated above, this Court finds to be a total of $128,251.25 and $469.69, respectively.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Judgment as a Matter of Law and for a New Trial (Docket No. 170) is GRANTED in part and DENIED in part, consistent with this Decision and Order.  Defendant Fruscione is granted judgment as a matter of law and is DISMISSED from this case.  A new trial on punitive damages will be scheduled by separate order if Plaintiff does not accept this Court's remittitur of punitive damages to a total award of $20,000.  Plaintiff shall file a notice within 10 days

of the entry date of this Decision and Order advising whether he will accept the remittitur.

FURTHER, Plaintiff's Motion for Attorney Fees and Costs (Docket No. 159) is GRANTED.  Defendants must pay Plaintiff a total of $128,251.25 in attorneys' fees, consistent with this Decision and Order.

FURTHER, that Plaintiff's Bill of Costs (Docket No. 168) is GRANTED. Defendants must pay Plaintiff a total of $469.69 in costs, consistent with this Decision and Order.

FURTHER, that the stay of execution and enforcement of judgment granted in this Court's [190] Order is VACATED.

SO ORDERED.


Dated:  June 10, 2016
            Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge